UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| MEGAN N. MULLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24-cv-00013-SEB-KMB |
| | ) | |
| NICK SMITH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Raymond Toops ("Mr. Toops") was arrested and booked into the Harrison County Jail ("the Jail") on October 9, 2022, and died by suicide thirteen days later. His estate, represented by personal representative Megan Mullins, sued Quality Correctional Care ("QCC"), the contracted medical provider at the Jail, and Dr. Kevin Dew ("the Medical Defendants"), as well as the Harrison County Sheriff and several Harrison County employees and officials based on this event. The Plaintiff and Medical Defendants have agreed to the dismissal of the claims against them. Dkt. 75, 79. The Harrison County Defendants moved for summary judgment. Dkt. 93. For the following reasons, the motion for summary judgment is **granted.**

### I.
### Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because

those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

Raymond Toops had a history of suicidal ideation and substance abuse. Dkt. 27 at 1. He was suffering from an acute mental health crisis when he was arrested on October 9, 2022. *Id.* He was a pretrial detainee when he died by suicide on October 22, 2022. *Id.* at 1-2.

At all times relevant to the complaint, Defendants held the following positions with Harrison County. *See* dkt. 98. Nick Smith was the Sheriff and was not involved in day-to-day

operations, but maintained disciplinary authority over Jail staff. Dkt. 98-1 at 78, 103; dkt. 98-2 at 16.

Kimberly Jenning was the Jail Commander and was involved in day-to-day operations at the Jail, was responsible for making sure that Jail staff knew of and were trained on policies, and was responsible for the overall administration of the Jail, including the jail staff who directly reported to her. Dkt. 98-1 at 10, 78, 103; dkt. 98-2 at 36.

Paul Bickel and Chance Owen were Lieutenants who acted as supervisors on their shifts. Dkt. 98-3 at 14. Lt. Bickel testified that staff did not receive annual suicide prevention training. *Id.* at 18. However, Lt. Bickel acknowledges that drug or alcohol withdrawal is a risk factor and an indicator for suicide. Dkt. 98-3 at 46.

Adam Cole, Kyle Clunie, Crystal Queen, Alexis Bohne, Hunter Spencer, Eric Langford, Haley Lanham, and Chandler Hodges were Correctional Officers. Dkt. 98-4 at 3-4, 6.

Michael Gregory was the County Nurse, who was responsible for responding to sick calls, addressing immediate medical needs, and conducting a medical assessment within the first fourteen days of an inmate's incarceration. Dkt. 98-1 at 14-15; Dkt. 98-5 at 18. Nurse Gregory was also responsible for communicating with the Jail doctor to facilitate medical treatment and prescription medications. Dkt. 98-1 at 14-15; dkt. 98-5 at 12. If an inmate had a mental health concern, they would make a request and be evaluated by Nurse Gregory and then seen by a mental health professional. Dkt. 98-5 at 26. The Jail Doctor would prescribe medication based on the mental health professional's recommendation. *Id.*

Dr. Kevin Dew, the Jail doctor, reviewed records or documents prepared by Nurse Gregory and conducted doctor-patient visits. Dkt. 98-5 at 7.

### B. Harrison County Policies

#### a. Mandatory Information Exchange (Policies 200 & 202)

The admissions policy dictates that booking officers "receive all information from the arresting officer" and "ask extensive suicide questions" during booking. Dkt. 95-2 at 1-2. Arresting officers should "immediately notify" booking officers of suspected medical conditions. Dkt. 95-3 at 1.

#### b. Mandatory Suicide Screening & Knowledge of Risk (Policy 402)

Policy 402 identifies "recent attempts or history of suicide attempts" as "strong indicators" of risk and classifies anxious or withdrawing inmates as high risk. Dkt. 95-4 at 1-2.

#### c. Mandatory Action & Access to Care (Policies 402 & 403)

Policy 402 dictates that positive screening responses are "immediately brought to the attention of health care and/or mental health staff." *Id.* at 2.

Policy 403 guarantees 24-hour mental health availability and requires medical consultation before housing decisions are made for inmates with psychiatric diagnoses. Dkt. 95-5 at 1-2.

#### d. Mandatory Classification (Policy 206)

The objective classification system requires officers to document observations that affect placement safety. Dkt. 95-7 at 3. Part F of the policy mandates that assessments include "reports from arresting officer." *Id.*

All jail staff who had frequent inmate contact receive training on the above policies. Dkt. 98-6 at 4. Part of the training included recognizing indicators of suicide and intervention in suicide attempts. *Id.* All inmates identified to be at risk of suicide are placed on constant video watch and subject to visual checks at least every fifteen minutes for a minimum of seventy-two hours. *Id.* at 3.

Lt. Bickel testified that he did not know how often suicide prevention training occurred, or if he had been trained since he was first hired. Dkt. 98-3 at 18-20. Lt. Bickel also testified he did not know anything regarding the policy on the quarterly hourly checks to monitor inmates. *Id.* at 72-73.

Officer Cole testified that suicide risk was only taken seriously if self-reported by an inmate. Dkt. 98-11 at 55. He also testified that he was instructed *not* to look at reports from arresting officers and otherwise disregarded such materials when assessing an inmate. *Id.* at 67; 96-97.

**C. October 9, 2022**

**a. Mr. Toops's behavior before the arrest**

On October 9, 2022, Mr. Toops's girlfriend, Jamie Love ("Ms. Love"), recalled that Mr. Toops was hearing voices that morning when she woke up, punched holes in her wall, and shot a gun at her in her house. Dkt. 98-7 at 41 (Love Deposition).

Ms. Love woke up to damage throughout her house and told Mr. Toops he needed to leave. *Id.* at 48-50. Mr. Toops indicated that he was going to leave and that he was going to take Ms. Love's Jeep. *Id.* at 50. Ms. Love told him not to take her Jeep and the couple walked outside and argued over who was driving. *Id.* at 50, 54-55. During the drive, Mr. Toops was "cussing and hollering" and pulling into oncoming traffic. *Id.* Ms. Love tried to open the door to jump out of the Jeep, but Mr. Toops assaulted her and caused her to lose consciousness. *Id.* at 55-56. Ms. Love eventually escaped from the Jeep, returned to her house, and saw that it had been "torn apart" and that her gun was missing. *Id.* at 56-59. Ms. Love called 911. *Id.* at 61.

**b. Deputy Schaefer's investigation and arrest**

Based on this conduct, Harrison County Sheriff Deputy Zackary Schaefer ("Deputy Schaefer") was dispatched to Ms. Love's house around 3:00 PM where she explained to him what happened that day. Dkt. 98-8 at 42, 49 (Schaefer Deposition). Among other things, Ms. Love told Deputy Schaefer that Mr. Toops was hearing things that were not there, that he put a handgun in his mouth, and that he was "ranting and raving" talking to himself. *Id.* at 52-53.

Deputy Schaefer noted that Mr. Toops "was having some mental health issues." Dkt. 98-8 at 33; *see also id.* at 55. Mr. Toops told Deputy Schaefer that he was struggling mentally and hearing voices. *Id.* at 34, 37, 54, 82. Deputy Schaefer found what Ms. Love told him to be credible enough to arrest Mr. Toops, and Deputy Schaefer's own investigation corroborated the conduct she described. *Id.* at 37. Deputy Schaefer described these events in a probable cause affidavit, signed under penalty of perjury. Dkt. 98-9 at 110-12.

Deputy Schaefer arrested Mr. Toops and transported him to the Jail for booking and processing. *Id.* at 79.

**c. Booking and Processing at the Jail**

At the Jail, Deputy Schaefer asked Mr. Toops a series of questions to fill out intake paperwork. Dkt. 98-8 at 79, 92-100; dkt. 98-9 at 14 (Inmate Commitment Form). Deputy Schaefer noted that Mr. Toops had a shoulder injury and diabetes for which he was previously prescribed metformin. Dkt. 98-9 at 14. Deputy Schaefer and the Jail staff working booking, Lt. Bickel, exchanged no information regarding Mr. Toops's mental state. Dkt. 98-8 at 100, 101-02.

Among other topics, Lt. Bickel asked Mr. Toops a series of suicide screening questions. Dkt. 98-3 at 59-61 (Bickel Deposition); dkt. 98-9 at 32 (Suicide Screening). Mr. Toops indicated to Lt. Bickel that he was not thinking about hurting himself, but he did disclose that he had

previously attempted suicide via car wreck. Dkt. 98-3 at 59-60; dkt. 98-9 at 34. During booking, Mr. Toops also disclosed to Lt. Bickel his history of drug addiction and drug treatment, as well as his history of psychiatric treatment, including that he had experienced a nervous breakdown and had taken medications for his nerves. Dkt. 98-3 at 61, 65-69; dkt. 98-9 at 34.

Lt. Bickel gathered no information from Deputy Shaefer, or anyone else, regarding Mr. Toops's arrest. Dkt. 98-3 at 79. Regardless, despite Mr. Toops's responses being a "strong indicator" for suicide watch, Lt. Bickel failed to immediately notify medical staff, failed to refer Mr. Toops for a mental health evaluation, and failed to place him on suicide watch. Dkt. 98-3 at 74-76.[1]

**D. Observed suicidal risk factors displayed after booking**

The day after Mr. Toops was processed, Lt. Bickel ordered a urine screen for Mr. Toops due to his behavior. Dkt. 98-3 at 47-48; dkt. 98-9 at 21 (Urine Screen). Mr. Toops tested positive for methamphetamine, amphetamine, MDMA, and THC. Dkt. 98-3 at 47-49; dkt. 98-9 at 21. Lt. Bickel still did not refer Mr. Toops to any medical personnel for monitoring despite him testing positive for four drugs. 98-3 at 76.

Based on the drug screen, Dr. Dew's October 10, 2022, Provider Order indicated that Mr. Toops should receive: "Clonidine .2 x 2 if he detoxes." Dkt. 98-9 at 20. Officer Queen signed off on this order. *Id.*

Three days after booking, on October 12, Lt. Pate completed an Initial Classification Assessment Scale, flagging Mr. Toops as having "Medical or Mental disabilities" and noting that Mr. Toops had some sort of "mental" disability. Dkt. 98-9 at 38-40.

---

[1] Plaintiff's brief argues that Defendants engaged in spoliation of evidence: "Defendants *destroyed* the surveillance video of the booking process, despite receiving a subpoena, and tort claim notice requiring its preservation." Dkt. 94 at 8 (citing dkt. 95-19; dkt. 95-20; dkt. 95-21). Without a pending spoliation motion, the Court takes no action regarding allegations of spoliation on summary judgment.

Mr. Toops spoke with Ms. Love during his incarceration and relayed that he asked jail staff for medical attention for his ongoing mental health issues. Dkt. 98-7 at 126-27. Mr. Toops told Ms. Love that he asked jail staff to see a doctor for medication for either depression or schizophrenia, but the jail staff "wouldn't let him do it." *Id.* at 127-28. He wanted to see a psychiatrist because of the "voices that he had heard" but the staff would not let him speak with a doctor. *Id.* at 128-29.

Officers Bohne, Spencer, Langford, Lanham, Hodges, and Owen all gave Mr. Toops diabetes medication at some point between his booking and his death. Dkt. 98-9 at 17-18. (Medication Administration Record).

**E. Medical Assessment**

Dr. Dew did not conduct a medical assessment of Mr. Toops. Dkt. 98-5 at 7. Dr. Dew did state that, given the circumstances surrounding his arrest, an arrestee in Mr. Toops's condition should have been taken to the hospital for clearance by the arresting officer before going to the Jail. *Id.* at 21.

**F. Mr. Toops's Death**

On October 22, 2022, Lt. Bickel and Officers Cole and Clunie were on duty for the overnight shift at the Jail. Dkt. 98-10 at 32 (Clunie Deposition); dkt. 98-11 at 16-17 (Cole Deposition), dkt. 98-3 at 70. The officers were dispersed throughout designated areas of the jail. Dkt. 98-10 at 32, dkt. 98-11 at 16-17; dkt. 98-3 at 70. The last time Mr. Toops was observed before his death was on October 22 before 11:00 PM by Officer Clunie and Lt. Bickel. Dkt. 98-10 at 50.

Around 4:00 AM on October 23, Officer Clunie tried to rouse Mr. Toops for his morning medication, but Mr. Toops did not wake up from sleeping. Dkt. 98-10 at 72-73. Officer Clunie then distributed medication to other inmates and returned to Mr. Toops's cell another time, with Lt. Bickel, to distribute Mr. Toops's medication. *Id.* at 74-75.

At approximately 4:50 AM, Officer Clunie entered Mr. Toops's cell and discovered him hanging from the cell's bunk. *Id.* The officers cut the clothing Mr. Toops had used to hang himself and began CPR. *Id.* at 75-76. Mr. Toops was declared dead at 5:05 PM by the coroner. Dkt. 98-9 at 88.

**G. Events after Mr. Toops's Death**

A few weeks after Mr. Toops's death, on December 9, 2022, Lt. Bickel authored an incident report, which he affirms under penalty of perjury that during booking Bickel asked him the suicide screening questions and Toops "stated he tried to committee suicide awhile back and when he tried to do in a car wreck." Dkt. 98-9 at 26 (errors in original).

Lt. Bickel told EMS that they had done a walkthrough at 3:00 AM, but they had not. Dkt. 95-31 at 3 (Bickel Termination). This was one of the reasons why Lt. Bickel was terminated. *Id.*

## III.
## Discussion

The Estate brings the following claims:

- Fourteenth Amendment (through 42 U.S.C. § 1983) claims against Jennings, Bickel, Cole, Clunie, Bohne, Queen, Spencer, Langford, Lanham, Hodges, Owen, and Gregory;
- A *Monell* claim against Sheriff Nick Smith; and
- State law claims against Harrison County, Indiana.

**A. Fourteenth Amendment claims**

A pretrial detainee's unconstitutional medical care claim, brought under the Due Process Clause of the Fourteenth Amendment, is analyzed according to the objective unreasonableness inquiry laid out in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Miranda v. County of Lake*, 900

F.3d 335, 352 (7th Cir. 2018). A defendant violates a pretrial detainee's due process right to constitutionally acceptable medical care if:

> (1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's] medical need; and (4) the defendant act[ed] "purposefully, knowingly, or perhaps even recklessly" with respect to the risk of harm.

*Gonzalez v. McHenry County, Ill.*, 40 F.4th 824, 828 (7th Cir. 2022) (quoting *Miranda*, 900 F.3d at 353−54). "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (cleaned up); *see also Pittman by and through Hamilton v. Madison Cnty., Ill.*, 108 F.4th 561, 570–72 (7th Cir. 2024).

Defendants do not dispute that suicide and suicidal ideation constitute objectively serious medical conditions. Dkt. 93 at 9. Thus, the Court must focus on the other factors. To survive summary judgment, the Plaintiff must show that Defendants "did not take reasonable available measures to abate the risk of serious harm to [Mr. Toops], even though reasonable officers under the circumstances would have understood the high degree of risk involved, making the consequences of the defendants' conduct obvious." *Pittman*, 108 F.4th at 572 (emphasis in original). "[A] pretrial detainee in a medical care case need not prove a defendant's subjective awareness of the risk of harm to prevail on a Fourteenth Amendment Due Process claim." *Id.* at 570.

**1. Defendants Jennings, Queen, Bohne, Spencer, Langford, Lanham, Hodges, and Owen**

Defendants first argue that "Plaintiff has presented no evidence that Jennings, Queen, Bohne, Spencer, Langford, Lanham, Hodges, or Owen knew anything about Toops prior to his

suicide." Dkt. 93 at 10. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.*

There is no evidence that any of these individual defendants were on notice that Mr. Toops was suicidal. As an initial matter, the record is clear that Jail Commander Jennings had no personal involvement in the events that gave rise to the complaint, other than being a supervisor at the jail. There is no supervisory liability under § 1983. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Thus, she is entitled to summary judgment.

While the medication administration record shows that Officers Bohne, Spencer, Langford, Lanham, Hodges, and Owen all gave Mr. Toops medication for his diabetes, dkt. 98-9 at 17-18, there is no evidence that Mr. Toops told any of those defendants anything regarding his mental state. Plaintiff argues that, according to Ms. Love, Mr. Toops begged jail staff for medical attention, for depression medication, and to see a mental health professional because he was hearing voices, but he was ignored. Dkt. 98-7 at 126-27. But Plaintiff cannot rely on this inadmissible hearsay statement to prevail on summary judgment. *See* Fed. R. Evid. 802 (hearsay without an exception is not admissible); *see also Murphy v. Caterpillar Inc.*, 140 F.4th 900, 907 (7th Cir. 2025) ("Evidence supporting and opposing a motion for summary judgment must be admissible in the same manner as at trial, except that parties may rely on sworn declarations in lieu of live testimony.") Regardless, Ms. Love's testimony does not indicate, which, if any, of the named defendants Mr. Toops complained to. The Court would have to speculate that Mr. Toops complained to each of the officers when they were giving him his medication, which it cannot do on summary judgment. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (concluding that

speculation that officer overheard inmate complain that he was feeling suicidal "is not enough for a plaintiff to escape summary judgment."). Based on the evidentiary record before the Court, no reasonable jury could find that Officers Bohne, Spencer, Langford, Lanham, Hodges, and Owen were personally responsible for a deprivation of Mr. Toops's constitutional rights.

Further, while the evidence presented shows that Officer Owen worked the night and early morning shift when Mr. Toops died, dkt. 98-9 at 25, 27, 29, 71, there is no evidence before the Court showing that Officer Owen *observed* suicidal behavior and acted objectively unreasonable in light of the circumstances. *See Estate of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 391 (7th Cir. 2024) ("[W]hen an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions.") (internal citations omitted).

Next, designated evidence also reveals that Officer Queen signed off on Dr. Dew's October 10, 2022, Provider Order, which states "Clonidine .2 x 2 if he detoxes." Dkt. 98-9 at 20. But knowledge of drug withdrawal does not equate to knowledge of suicide risk. Unfortunately, many individuals have substance abuse issues and are detoxing from illicit drug consumption after their arrest, but it does not follow that all should be placed on suicide watch. *Cf. Estate of Wallmow*, 99 F.4th at 391 ("The facts should point directly at suicidality, for a deceased's 'general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide.'") (quoting *Jump v. Village of Shorewood*, 42 F.4th 782, 794 (7th Cir. 2022)).

Officers Cole and Clunie were on duty for the overnight shift on October 22, the night that Mr. Toops's committed suicide. Dkt. 98-10 at 32; dkt. 98-11 at 16-17, dkt. 98-3 at 70. Officer Clunie was the officer who last observed Mr. Toops before his suicide, when he entered Mr. Toops's cell to give him his morning medication at 4:00 AM, but Mr. Toops did not wake up when Officer

Clunie roused him. Dkt. 98-10 at 72-73. Officer Clunie finished distributing medication to other inmates and returned to Mr. Toops cell with Lt. Bickel nearly an hour later, at 4:50 AM, and found Mr. Toops hanging from his cell bunk. *Id.* at 74-76.

Thus, although it is undisputed that Officers Cole and Clunie were present at the Jail on October 22, Officer Cole was merely on duty during that shift, and Officer Clunie was the officer administering medication during the morning of October 22. There is no evidence that they were "on notice of any risk of harm" such that they should have taken any preventative steps to protect Mr. Toops. *Estate of Wallmow*, 99 F.4th at 392; *see Est. of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (affirming grant of summary judgment to correctional defendant whose involvement was limited to administering emergency care to inmate prior to his death).

To summarize, summary judgment is **granted** as to the Fourteenth Amendment claims against Defendant Jennings because she never personally interacted with Mr. Toops, and it is **granted** as to Defendants Queen, Bohne, Spencer, Langford, Lanham, Hodges, Owen, Cole, and Clunie because there is no admissible evidence that they acted objectively unreasonable during any interaction with Mr. Toops.

2. **Defendant Bickel**

The individual defendant who had the most intimate interactions with Mr. Toops was Lt. Bickel, and the Court again summarizes these interactions.

First, the evidentiary record reflects that Deputy Schaefer provided no information to Lt. Bickel about Mr. Toops's mental state as it related to his arrest and his concerning behavior before his arrest. Dkt. 98-8 at 100, 101-02. During his intake into the jail, as part of a suicide screening, Mr. Toops told Lt. Bickel that he was not thinking about hurting himself, but he did disclose that he had previously attempted suicide via car wreck. Dkt. 98-3 at 59-60; dkt. 98-9 at 32-34. Mr.

Toops also disclosed to Lt. Bickel his history of drug addiction and drug treatment, psychiatric treatment, having had a nervous breakdown, and taking medications for his nerves. Dkt. 98-3 at 61, 65-69; dkt. 98-9 at 34.

Lt. Bickel gathered no information from Deputy Shaefer, or anyone else, regarding Mr. Toops's arrest. Dkt. 98-3 at 79. Even after Mr. Toops's responses were a "strong indicator" for suicide watch, Lt. Bickel testified that he failed to immediately notify medical staff, failed to refer Mr. Toops for a mental health evaluation, and failed to place him on suicide watch. Dkt. 98-3 at 74-76. The day after Mr. Toops was processed, Lt. Bickel ordered a urine screen for Mr. Toops due to his behavior. Dkt. 98-3 at 47-48; dkt. 98-9 at 21. Mr. Toops tested positive for methamphetamine, amphetamine, MDMA, and THC. Dkt. 98-3 at 47-49; dkt. 98-9 at 21. Lt. Bickel did not refer any medical personnel to monitor Mr. Toops further despite the positive drug test. Dkt. 98-3 at 76.

Two hours before Mr. Toops's death, Lt. Bickel failed to do a 3:00 AM walkthrough, but lied to EMS after Mr. Toops had died, and told them that they did do a walk through. Dkt. 95-31 at 3. This incident was one of the many reasons for Lt. Bickel's termination from the Jail. *Id.*

As an initial matter, "an 'express statement that [the deceased] was not considering suicide' from the deceased himself weighs heavily against objective unreasonableness." *Estate of Wallmow*, 99 F.4th at 391. But the Court must consider the totality of the information that Lt. Bickel had when assessing his reasonableness, and Lt. Bickel knew other information that could have prompted more action. In doing his screening intake, Lt. Bickel's learned that that Mr. Toops had a history of one suicide attempt, drug addiction, and psychiatric treatment (including having nervous breakdowns for which he was previously prescribed medication), and he exhibited behavior that prompted Lt. Bickel to request a urine screening (which resulted in a positive test

result for four drugs). Despite this information, Lt. Bickel did not refer Mr. Toops for suicide watch or even for a mental health assessment. Lt. Bickel also ignored the jail's walk-through policy the night of Mr. Toops's suicide and subsequently lied about it. Defendant Bickel asserts that he is entitled to qualified immunity, dkt. 93 at 13, which the Court evaluates below.

a. **Qualified Immunity**

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Although qualified immunity is an affirmative defense, plaintiff has the burden of defeating it once defendants raise it. *Archer v. Chisolm*, 870 F.3d 603, 613 (7th Cir. 2017). Thus, to overcome the defense, Plaintiff must show that: (1) Defendant violated his statutory or constitutional rights; and (2) the right was clearly established at the time of the challenged conduct. *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025). Courts may exercise their discretion to choose which element to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here, the Court addresses the second element.

To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). "Existing precedent must place the constitutional or statutory question beyond debate" so that "every reasonable official would understand that what he is doing is unlawful." *Sabo*, 128 F.4th at 844 (internal quotations and citations omitted).

Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Doing so evades the crucial question of "whether the official acted reasonably in the particular circumstances that he or she faced."

*Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014). The right has been defined "too generally if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established." *Sabo*, 128 F.4th at 844. "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (cleaned up).

Existing precedent does not have to be "directly on point" to clearly establish a right. *Id.* at 545; *but see Zorn v. Linton*, 146 S. Ct. 926, 931 (2026) (explaining that circuit court precedent establishing that a wide range of aggressive conduct might constitute excessive force did not put officer on notice that his specific conduct was unlawful). However, to meet his burden on this element, Plaintiff must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). The failure to do so means that Plaintiff "cannot defeat" a "qualified immunity defense." *Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (reversing summary judgment denial on qualified immunity grounds because plaintiff did not identify a sufficiently analogous case or explain why defendant's actions were plainly excessive).

Defendant Bickel argues that he is entitled to qualified immunity because "no reasonable corrections officer in the position of [Lt. Bickel] would understand that keeping an eye on an inmate who denied being suicidal although he had a history of substance abuse and suicide attempt, would violate the inmate's constitutional rights." Dkt. 93 at 14.

In response, Plaintiff argues that our Circuit has long recognized that jail officials violate the Fourteenth Amendment when they fail to take reasonable measures in the face of suicide risk.

Dkt. 93 at 22 (citing *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001); *Cavalieri v. Shepard*, 321 F.3d 616, 622–23 (7th Cir. 2003); *Collins v. Seeman*, 462 F.3d 757, 760–61 (7th Cir. 2006)). While those cases do stand for that general principle, they are not closely factually analogous to the circumstances at hand in this case. Rather, the factual distinctions between *Sanville*, *Cavalieri*, and *Collins*, tend to favor Lt. Bickel. For example, in *Sanville*, the Court reversed the district court's grant of the correctional officers' 12(b)(6) motion on qualified immunity grounds. 266 F.3d at 741. In *Sanville*, the district court only had the facts in the complaint to work with; in other words, the factual record was not yet developed. *See id.* But here, discovery has closed and the parties have designated evidence in support of and in opposition to summary judgment. *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (internal citations omitted).

In *Cavalieri*, the Seventh Circuit noted that strange behavior was insufficient to impute subjective knowledge of impending harm. 321 F. 3d at 621. There, though the Court found that the officer was not entitled to qualified immunity, the officer was informed that the inmate was at risk of suicide by the inmate's mother and girlfriend, and acknowledged that he understood the severity of the inmate's mental health by assuring his mother he would not be alone. *Id.* at 621-22. No such facts exist here. There is no evidence that Lt. Bickel was ever told that Mr. Toops was a suicide risk, and no evidence that he acknowledged such understanding of his mental state, or reassured anyone. The facts of this case are likewise distinguished from those in *Collins*. 462 F.3d at 761−62 (affirming grant of summary judgment to officer who sought assistance for inmate who told officer he was suicidal).

In fact, several recent cases from the Seventh Circuit affirmed the grant of summary judgment in an officer's favor with facts that are similar to those present here. In *Pulera*, the Court found that an inmate's statements during an intake screening about his past treatment for depression and his brother and mother's recent suicides would not put a reasonable officer on notice that he was at risk of suicide. 966 F.3d at 551. The Court reasoned that these "scant comments" were insufficient to raise a factual dispute because "'not every prisoner who shows signs of depression . . .can or should be put on suicide watch.'" *Id.* (quoting *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003)). In *Jump*, the recently arrested inmate was under the influence of drugs and had overdosed on drugs before his arrest, and he told the officer during screening about his past psychiatric treatment. 42 F.4th at 793. The inmate also showed signs of distress by slamming his body against the cell bars. *Id.* The Court found, "with *Pulera* in mind—each of these facts would not have made a reasonable officer in [Defendant's] position think [the decedent] was suicidal." The Court found it "most dispositive[ ]" that not only had the decedent not told the officers he was feeling suicidal, he "had affirmatively told both the opposite." *Id.* Officers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "know[ n]" that it proscribed their specific conduct. *Zorn*, 146 S. Ct. at 930 (citing *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)). Given that the officers' conduct in these cases was similar to Lt. Bickel's conduct, he would not have been on notice that his actions were objectively unreasonable.

In short, Plaintiff has not met his burden of identifying a close factually analogous case. Plaintiff only cited cases that generally discuss suicide in a prison context. Plaintiff has not presented the Court with precedent relevant to whether it is enough for a correctional officer to just keep an eye on an inmate who denied being suicidal although he had a history of substance

abuse and one known suicide attempt. And *Estate of Wallmow*, *Pulera*, and *Jump* are factually similar cases in which the defendant officers were found to have acted reasonably and where summary judgment was affirmed in their favor.

Accordingly, Defendant Bickel is entitled to qualified immunity. Summary judgment is granted as to the Fourteenth Amendment claim against him.

**B. *Monell* claim against Sheriff Nick Smith**

In order to maintain a § 1983 claim against Sheriff Smith, Plaintiff must show that his constitutional rights were violated by a policy or custom of the Jail. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694–95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

Proving a *Monell* claim is "a three-part test: the Estate must show '(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Estate of Wallmow*, 99 F.4th at 393–94 (quoting *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020)).

Here, the Estate does not challenge the written policies related to suicide prevention or health screenings. Rather, it challenges the lax enforcement of those policies. But "[s]uch claims can prevail only where the lax practice was 'so pervasive that acquiescence on the part of policymakers was apparent." *Id.* at 394 (quoting *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020)). To do this, a plaintiff usually cannot just present evidence of "one or two missteps" but rather must show "systemic and gross deficiencies." *Hildreth*, 960 F.3d at 426 (internal citations omitted); *see also Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (when

challenging an unconstitutional municipal practice or custom, the plaintiff must show "evidence that the identified practice or custom caused multiple injuries.") (cleaned up).

The Estate has presented no evidence that systemic deficiencies in the application of their various policies have resulted in injury to other inmates at the Jail. *See Estate of Wallmow*, 99 F.4th at 394 (affirming summary judgment as to *Monell* claim because Estate failed to show that any lax enforcement of policies was pervasive, and decedent's suicide was the first in the jail's 20-year history). At most, the Estate has shown that Lt. Bickel may not have followed the policy when he failed to refer Mr. Toops to a health provider given Mr. Toops's statement about his mental health background during the screening. But this was the act of one officer, and the Court has concluded that he was entitled to summary judgment on qualified immunity. Nothing suggests this was a pervasive issue. Accordingly, Sheriff Smith is entitled to summary judgment on the *Monell* claim against him.

**C. State law claims against Harrison County**

Plaintiff brought state law claims of *respondeat superior* liability for negligence resulting in wrongful death and *respondeat superior* liability for failure to train and failure to supervise. With Plaintiff's constitutional claims staged for dismissal, the Court has discretion whether to exercise supplemental jurisdiction over his remaining state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law

claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and quoted authority omitted).

In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and quoted authority).

No circumstance in this case overcomes the presumption that the Court should relinquish jurisdiction over Plaintiff's state-law claims.

The statute of limitations is not a factor. Both federal and state law toll the relevant limitation period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

The Court has not expended significant resources on the pending state-law claims. The Court does not expect that the parties' discovery and briefing efforts with respect to the state law claims will go to waste. Rather, the evidence and legal research they have uncovered should be every bit as relevant in a state-court proceeding.

Further, it is not absolutely clear how the state-law claims should be resolved. The outcome of Plaintiff's *respondeat superior* claims are not so obvious as to weigh in favor of the federal court retaining jurisdiction. Finally, comity always favors allowing state courts to decide issues of state law. Having resolved all claims within its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Plaintiff's state law claims.

## IV.
## Motion to Exclude Expert Witness

Pending before this Court is also Plaintiff's motion to exclude Defendants' purported expert witnesses pursuant to Fed. R. Civ. P. 37(c)(1). Dkt. 100. That motion, dkt. [100], is **granted** to the extent that the Court relied on no expert testimony in deciding summary judgment.

## V.
## Conclusion

Mr. Toops's death by suicide was tragic. However, there is no evidence that any of the named defendants acted unreasonably in their interactions with Mr. Toops in the days and hours before his death. For the foregoing reasons, Harrison County Defendants' motion for summary judgment is **GRANTED**. Dkt. [93]. Final judgment shall issue by separate entry.

**IT IS SO ORDERED.**

Date: 9/21/2026

Sarah Evans Barker

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel